UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEE A. BAKER,<br><br>                                    Plaintiff,<br><br>v.<br><br>NATHANIEL BIER, ROBERT GIBSON,<br>and DOES 1-10,<br><br>                                    Defendants. | Case No.:  15-cv-1568-CAB (DHB)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>**[Doc. No. 36]** |

Pending before the Court is Defendants' motion for summary judgment or in the alternative partial summary judgment.  [Doc. No. 36.]  For the reasons set forth below, the motion for summary judgment is **GRANTED**.

BACKGROUND

On July 15, 2015, Plaintiff filed a complaint setting forth three causes of action under 42 U.S.C. §1983, as well as various state law causes of action, arising from an incident involving Deputies Bier and Gibson on July 19, 2013.  [Doc. No. 1.]  On October 9, 2015, Plaintiff filed a First Amended Complaint setting forth the three causes of action under 42 U.S.C. §1983 but omitting the state law causes of action.  [Doc. No. 6.]  On October 27, 2015, Defendants filed a motion to dismiss the FAC.  [Doc. No. 8.]  In opposition, Plaintiff requested leave to amend.  [Doc. No. 9.]  Therefore, on November

23, 2015, the Court granted Plaintiff's request for leave to amend and denied the motion to dismiss the FAC as moot. [Doc. No. 12.]

On December 3, 2015, Plaintiff filed a Second Amended Complaint which also sets forth three causes of action pursuant to 42 U.S.C. §1983 for the following alleged constitutional violations: 1) unlawful seizure, in violation of the Fourth Amendment; 2) excessive force, in violation of the Fourth Amendment, and 3) deliberate indifference to his serious medical need, in violation of the Eighth Amendment. [Doc. No. 13.]

On December 16, 2015, Defendants filed a motion to dismiss the SAC. [Doc. No. 14.] On January 28, 2016, the Court granted the motion in part, and dismissed the §1983 claims for unlawful seizure and deliberate indifference to his serious medical need. [Doc. No. 17.] Thus, the only remaining claim against Defendants is for excessive force.

On September 8, 2017, Defendants filed a motion for summary judgment or in the alternative partial summary judgment. [Doc. No. 36.] On October 6, 2017, Plaintiff filed an opposition. [Doc. No. 43.] On October 13, 2017, Defendants filed a reply to the opposition. [Doc. No. 47.]

## STATEMENT OF FACTS

A. Defendants' Proffer.[1]

On July 19, 2013, Deputy Bier and Deputy Gibson were on patrol in Poway when they received a radio call reporting a domestic dispute at the intersection of Parkway Center Drive and Scripps Poway Parkway. (Ex. A1 – Bier Dec. at ¶ 3; Ex. B – Gibson Dec. at ¶ 3.) It was reported that a man was observed assaulting a woman, that the woman hit the man in the head with a beer bottle, and both were covered with blood. (*Id.*) The dispatcher advised that the male had left the scene and was walking northbound on Parkway Centre Drive from Scripps Poway Parkway. (Ex. A – Bier Dec. at ¶ 3.) Deputy Bier responded to the scene. (Ex. A – Bier Dec. at ¶ 4.) As he responded, he

---

[1] Doc. No. 36-1 at 5-9. The Court does not necessarily agree with Defendants' characterization of the proffered testimony.

activated a video camera in his patrol vehicle and placed it on the dashboard. (*Id.*; Ex. C – Incident Video.) When Deputy Bier was on Danielson Street, he observed Plaintiff walking. (Ex. A – Bier Dec. at ¶ 5.) Plaintiff matched the description of the male involved in the domestic violence dispute and he had blood on his face. (*Id*.)[2]

Based on the description provided by dispatch, both Deputy Bier and Deputy Gibson believed that they were responding to a potential domestic violence call. (Ex. A – Bier Dec. at ¶¶ 3 & 6; Ex. B – Gibson Dec. 3.) Both deputies were aware that responding to domestic violence calls are some of the potentially most dangerous situations for law enforcement because of the level of emotions involved. (Id.) With this in mind, Deputy Bier parked his car then approached Plaintiff on foot and ordered him to sit on the curb to place him in a position of disadvantage. (Ex. A – Bier Dec. at ¶ 6.) Initially, Plaintiff did not comply with the instruction and presented an agitated manner. (Id.) Deputy Bier instructed Plaintiff to sit down a second time and he complied. (Id.) Deputy Bier asked Plaintiff if he required medical care, but Plaintiff did not respond. (Id.)

Out of concern for his own safety, as well as to prevent Plaintiff from fleeing during his investigation, Deputy Bier determined it was necessary to handcuff Plaintiff before questioning him. (Ex. A – Bier Dec. at ¶ 7.) Deputy Bier's concern was based on several factors: the nature of the call (probable domestic violence situation where Plaintiff had been reported to have assaulted a woman); that Plaintiff had not been searched for weapons; that Deputy Bier was the only deputy on the scene; as well as Plaintiff's agitated attitude and demeanor. (Id.) Deputy Bier ordered Plaintiff to place his hands behind his back so he could be handcuffed. (Id.) Plaintiff did not comply. (Id.) Deputy Bier repeated his command several times and Plaintiff continued to refuse to submit to handcuffing. (Id.) Deputy Bier withdrew his Taser and pointed it at Plaintiff's feet, but Plaintiff continued to refuse to put his hands behind his back. (Id.) Plaintiff told

---

[2] Plaintiff suffered a laceration and bruise to his nose when his girlfriend threw a frozen Gatorade bottle at him. (Ex. D – Excerpt from Plaintiff's Depo. at 61:23-62.5.)

Deputy Bier that he was not going to put his hands behind his back. (Id.; Ex. D – Excerpt from Plaintiff's Depo. at 72:17 – 22.) Deputy Bier spent approximately one minute attempting to gain compliance from Plaintiff with verbal and visual commands. (Ex. A – Bier Dec. at ¶ 7; Ex. C – Incident Video at 1:24 – 2:27.)

After Deputy Bier's numerous attempts using verbal and visual techniques to gain compliance from Plaintiff failed, Deputy Bier re-holstered his Taser and walked behind Plaintiff who was still sitting on the curb. (Ex. A – Bier Dec. at ¶ 8; Ex. C – Incident Video.) As Deputy Bier walked behind Plaintiff, Deputy Bier observed Plaintiff lock his hands together in front of his body and tense up. (Id.) Fearing that Plaintiff was going to resist, attempt to assault him, or escape, Deputy Bier tried to gain a tactical advantage by placing his hands on Plaintiff's back and pushing Plaintiff forward. (Id.) Deputy Bier followed Plaintiff to the ground where Plaintiff continued to refuse to put his hands behind his back so that Deputy Bier could place the handcuffs on Plaintiff. (Id.)

Deputy Bier then placed his right arm around Plaintiff's neck and straddled Plaintiff's back in an attempt to control him. (Ex. A – Bier Dec. at ¶ 9; Ex. C – Incident Video.) Deputy Bier used the microphone on his shoulder to notify dispatch that he needed cover. (Id.) Plaintiff continued to resist Deputy Bier's attempts to place Plaintiff in handcuffs. (Id.) Deputy Bier began to attempt to apply pressure to Plaintiff's carotid artery but Deputy Bier knew that Plaintiff was able to breathe because Deputy Bier was not applying much pressure. (Id.) Plaintiff continued to resist by grabbing onto Deputy Bier' arm and pulling it away from him. (Id.) Plaintiff was also tensing his body and trying to get out of Deputy Bier's grasp. (Id.)

As Deputy Gibson arrived on the scene, he perceived that Plaintiff was successfully resisting Deputy Bier's attempt to place Plaintiff in a carotid restraint hold. (Ex. B – Gibson Dec. at ¶ 4.) It appeared to Deputy Gibson that Plaintiff was able to lift Deputy Bier's left arm up over Plaintiff's chin and it appeared that Plaintiff was biting Deputy Bier's left forearm and was about to kick Deputy Bier with both feet or use his feet to break free. (Id.) It was Deputy Gibson's impression that Plaintiff was very close to

escaping Deputy Bier's hold. (Id.) Deputy Gibson was concerned for Deputy Bier's safety. (Id.)

When Deputy Gibson approached, Deputy Bier and Plaintiff, Deputy Bier stopped attempting to apply the carotid restraint hold. (Ex. A – Bier Dec. at ¶ 10.) Nevertheless Plaintiff continued to resist Deputy Bier's attempts to gain control of his arms. (Id.) Deputy Gibson placed his knee on Plaintiff's abdomen. (Ex. B – Gibson Dec. at ¶ 5; Ex. C – Incident Video.) Noting that hand to hand combat was not working to gain control of Plaintiff, Deputy Gibson then un-holstered his Taser and removed its cartridge so it would be in drive stun mode (which has a lesser quantum of force than when the probes are deployed). (Id.) Deputy Gibson placed the Taser against Plaintiff's pectoral muscle and then ordered Plaintiff to stop resisting immediately or warned that he would be Tased. (Id.) Plaintiff responded by stating "fuck you." (Ex. B – Gibson Dec. at ¶ 5; Ex. D – Excerpt from Plaintiff's Depo. at 91:22 – 92:4.) Deputy Gibson made a second order to Plaintiff to stop resisting or he would be Tased. (Ex. B – Gibson Dec. at ¶ 5.) Plaintiff continued to struggle and Deputy Gibson activated his Taser for 3 to 5 seconds. (Id.) Plaintiff let go of his hold on Deputy Bier and rolled onto his stomach. (Id.; Ex. C – Incident Video.) Plaintiff brought both of his hands underneath his body and began to push himself up. (Id.) Concerned that Plaintiff would be in a position of advantage if he got up, Deputy Gibson placed the Taser on Plaintiff's back and activated the charge again. (Id.) Plaintiff then stopped resisting and submitted to handcuffing. (Id.; Ex. A – Bier Dec. at ¶ 10.) Neither deputy used further force against Plaintiff after he stopped resisting. (Id.)

Deputy Bier suffered a slight abrasion to his left forearm. (Ex. A – Bier Dec. at ¶ 11.) Plaintiff claims he suffered: several minor asphalt abrasions to his face, elbow, hand, and knees; Taser marks on his chest and back; cuts on his wrists from the handcuffs; as well as right shoulder pain and discomfort from the encounter with Defendants. (Ex. E – Pl.'s Interrogatory Response No. 1.) Plaintiff does not know if the cuts on his wrists allegedly caused by the handcuffs occurred when the handcuffs were initially applied, or

later when he was in the care of other, non-defendant deputies. (Ex. D – Excerpt from Plaintiff's Depo. at 151:12 – 152: 15 & 153:15 – 155:8.) Plaintiff did not ask Deputy Bier or Deputy Gibson to loosen the handcuffs. (Id. at 152:13 – 15.) Plaintiff was taken to a hospital for the evaluation of his injuries. (Ex. A – Bier Dec. at ¶ 10.)

Plaintiff was arrested and was convicted for being under the influence of methamphetamines during the incident. (Ex. D – Excerpt from Plaintiff's Depo. at 102:1 – 22.)

### B. Plaintiff's Proffer.[3]

At approximately 5:53 p.m. Defendant Bier received a radio call of, "a male and female actively in a physical confrontation. The male was seen assaulting the female. Assault without injury is misdemeanor assault (PC §240). The female had also hit the male in the head with a beer bottle. The male was bleeding in result of the beer bottle hitting him in the head. While (Defendant Bier) was en route, dispatch advised that the male had left the scene and was walking northbound on Parkway (sic) Center Drive from Scripps Poway Parkway." (Excerpt of Defendant Bier's Sheriff Deputy Officer report, p. 1, ¶1).

As Defendant Bier travelled eastbound on Danielson toward Parkway (sic) Centre Drive he notice a man who matched the description given by dispatch walking down the street. (Id. at p. 1 ¶2). The male had a lot of blood on his face that looked as if it were coming from his nose. The man was later identified as Mr. Baker. (Id) Defendant Bier stopped his patrol car and approached Mr. Baker on foot. (Excerpt of Lee Baker Depo. at 69:20-24). Defendant Bier told Mr. Baker to sit down twice. Mr. Baker told Defendant Bier he would sit down and did sit down within thirteen seconds of their contact. [Criminal Trial (CT) TS Vol. 1 at 225:27-28, to 226:1, 16-18]. Defendant Bier asked Mr. Baker whose blood was on him. Mr. Baker told Defendant Bier that it was his

---

[3] Doc. No. 43 at 6-11.  The Court does not necessarily agree with Plaintiff's characterization of the proffered testimony.

blood, that he had just been attacked by his girlfriend, that she had thrown a frozen bottle of Gatorade at his face, that he was the victim and he might need medical attention. (Excerpt of Lee Baker Depo at 70:13-19).

Next Defendant Bier told Mr. Baker to put his behind his back because he was under arrest. (Id. at 70:21-22.) Mr. Baker asked why he needed to put his hands behind his back; he was the victim. (Id. at 70:24-25.) Mr. Baker asked what he was being arrested for. (Excerpt of Lee Baker Depo at 71:1). Defendant Bier never advised Mr. Baker why he was being detained or arrested. [PE TS at 36:1- 17]. Prior to Defendant Bier pointing his taser at Mr. Baker and as Defendant Bier continued to tell Mr. Baker to put his hands behind his back, Mr. Baker continued to ask what he was being arrested for and to try to explain the situation to Defendant Bier but Defendant Bier was not listening. Defendant Bier never told Mr. Baker that he was placing him in handcuffs for officer safety or because he was conducting an investigation. [CT TS Vol. 1 at 207:1-7].

At trial Defendant Bier could not recall whether Mr. Baker asked why he was being arrested or whether Mr. Baker told Defendant Bier he was the victim of a battery. "I cannot recall the whole conversation…I can't remember what he said." (CT TS at 205:22-27). While watching the video Defendant Bier acknowledged that Mr. Baker was talking, "His lips moving. Yes." (CT TS at 230:25-28; 231:1, 23-28, 232:1-15). But Defendant Bier answered at least six times "no," as he watched the video, he could not recall what Mr. Baker said to him. (CT TS at 230-232).

Defendant Bier testified he remembered thinking that it seemed like Mr. Baker was wondering why he was being told to put his hands behind his back but he testified he did not remember Mr. Baker asking him why he was being told to put his hands behind his back. (CT TS at 231:3-8, 17-18). Defendant Bier testified three times during the underlying criminal proceedings. He never testified that Mr. Baker told him he was not going to put his hands behind his back as he did recently in his declaration. Now Defendant Bier remembers Mr. Baker telling him he wouldn't put his hands behind his back. But, he does not acknowledge the other half of Mr. Baker's statement which was,

"until you tell me what I'm being arrested for." [CT TS Vol. 2 at 56:11-12.]

Defendant Bier acknowledged that Mr. Baker "wasn't aggressive towards me. He wasn't trying to fight me." [CT TS Vol. 1 at 206:16-17.] Defendant Bier also acknowledged that at no time prior to Defendant Bier going behind Mr. Baker to try to handcuff him did Mr. Baker make any movement forward, or up, looking like he was going to flee. [CT TS Vol. 1 at 199:14-17]. As Mr. Baker sat on the curb, after Defendant Bier told him to sit on the curb, Mr. Baker never tried to reach into his pocket, never reached his hand toward any other part of his body, didn't reach his arms out to Defendant Bier. (CT TS Vol. 1 at 199:5-13). After he sat down Mr. Baker never tried to get up from the curb again. At no time did Mr. Baker ever try to punch or kick Defendant Bier, nor did he threaten him. [PE TS at 30:3-12; 61:24-28].

Defendant Bier was the first deputy to arrive on scene. He knew, however, before he went hands-on with Mr. Baker, that Defendant Gibson was en route to Defendant Bier's location. [CT TS Vol. 1 at 201:5-6, 11-12]. Defendant Bier noticed a slight size difference but never mentioned being concerned about a size differential between him and Mr. Baker, or that he was particularly intimidated by Mr. Baker. Defendant Bier testified that he was only one inch shorter and 20 pounds lighter than Mr. Baker. [CT TS Vol. 1 at 204:1-15].

Defendant Bier decided to immediately put Mr. Baker in handcuffs because it was his "common procedure" when he was by himself to place someone he is contacting in handcuffs for his safety, and to control the situation because he "didn't have to worry about him anymore by placing him in handcuffs." [PE TS at 17:17-25].

Defendant Bier never tried to engage Mr. Baker in any friendly or quasi-friendly conversation at all. [CT TS Vol. 1 at 221:19-22]. Defendants' expert Ronald McCarthy testified that verbalization during a detention is a technique that should be employed by San Diego Sheriff's Deputies when possible, and Sheriff's Deputies are directed to use this technique in San Diego Sheriff training materials "Addendum F." (Excerpt of Ronald McCarthy Depo. at 32:2-25; 33:1-2.)

8

Mr. Baker had not given Defendant Bier any indication that he was a present physical threat to Defendant Bier or anyone else, and he had made no movements to flee at the initial encounter. [Motion to Suppress (MS) TS at 50:18-25]. Defendant Bier agreed that Mr. Baker had submitted to him when Mr. Baker was seated on the curb and before Defendant Bier tried to put the handcuffs on. [MS TS at 53:18-22].

That's why Mr. Baker could not understand why Defendant Bier wanted to handcuff him, and despite his multiple inquiries, Defendant Bier wasn't telling. Contrary to what the Sheriff's Department teaches, and Defendant Bier learned in training manual "Addendum F," that is, to use verbalization to prevent escalation of a situation, including explaining any actions that are about to be taken, Defendant Bier didn't do that. [CT TS Vol. 1 at 211:10-16]

Defendant Bier testified at trial he said only three things to Mr. Baker before going hands on with him: 1. Sit down; 2. Do you need medical attention, and 3. Put your hands behind your back. [CT TS Vol. 1 at 221:10-18]. Defendant Bier admitted that if verbalization had been used in the beginning of the encounter it is possible the situation with Mr. Baker could have been deescalated. [CT TS Vol. 1 at 211:23-28; 212:1-4.] Further, Defendant Bier admitted that by yelling within the first minute of their contact Defendant Bier "heightened the level of" the situation. [CT TS Vol. 1 at 222:13-14].

When Defendant Bier went behind him, Mr. Baker was scared and felt like he was being attacked. [CT TS Vol. 2 at 56:14-19]. Defendant Bier appeared as if he was going to grab Mr. Baker's arms but then he pushed Mr. Baker onto the ground. [CT TS Vol. 1 page 170, lines 16-17]. Mr. Baker put his arm out to break his fall but he made no movement to specifically avoid being handcuffed, to fight Defendant Bier or try to get away; he simply held himself up off the ground. [CT TS Vol. 1 at 171:4-5, 9-12; Incident Video]. Defendant Bier then wrapped his body around Mr. Baker and rolled Mr. Baker into a supine position. [CT TS Vol. 1 at 172: 4-8]. Mr. Baker remained essentially still. He did not flail, hit, or kick. (Incident Video).

Then Defendant Bier wrapped his arm around Mr. Baker's neck in a chokehold. He

placed his forearm over Mr. Baker's trachea and squeezed so Mr. Baker could not breathe. [CT TS Vol. 2 at 56: 24-26]. Mr. Baker was afraid for his life. [CT TS Vol. 2 at 56: 27-28; Excerpt of Lee Baker Depo. at 79:6-7]. Mr. Baker still did not fight back but he did try to get Defendant Bier's arm off of his trachea by tapping on Defendant Bier's arm. [CT TS Vol. 2 at 57:7-14]. Defendant Bier agreed he may have been putting pressure on Mr. Baker's windpipe. [CT TS Vol. 1 at 219:4-6]. Mr. Baker was not tense and he did not try to get out of Defendant Bier's hold. [Incident Video; CT TS Vol. 2 at 70: 13-17; Excerpt of Lee Baker Depo. at 79:12-22]. To the contrary, he did not fight back, for fear he would be shot and killed. [Excerpt of Lee Baker Depo. at 80:5-8].

Defendant Bier had Mr. Baker under control when Defendant Gibson arrived shortly thereafter and jumped on Mr. Baker's abdomen, placing his knee in Mr. Baker's chest. [Excerpt of Lee Baker Depo. at 82: 24-25, 83: 1-2]. Defendant Gibson tased Mr. Baker once in the chest, Defendant Bier released his hooks around Mr. Baker's legs so he could roll over and Mr. Baker did roll over. "And right when he was tased he immediately rolled over and I was able to put my leg – my leg across his lower leg to keep him from kicking. And I put him in handcuffs." [(Excerpt of Defendant Bier's Sheriff Deputy Officer report, p. 2, ¶2; PE TS at 24:1-5, 19:3-10]. Mr. Baker was tased at least one more time in his back after he rolled over even though according to Defendant Bier Mr. Baker was compliant. [Decl. of Deputy Gibson in Support of Defendants' Motion for Summary Judgment at 4: 22; PE TS Vol. 1 at 19: 9-10].

At no time prior to Mr. Baker's arrest did Defendants Bier or Gibson form the opinion or any suspicion that Mr. Baker was under the influence of methamphetamine or any other drug, nor did that possibility affect the way Mr. Baker's detention or arrest was handled. [CT TS Vol. 1 at 198:17-28; 199:1-2]. Mr. Baker was neither field-tested nor arrested for being under the influence of drugs. [CT TS Vol. 1 at 305:3-20]. At the time of his arrest neither Defendants intended to arrest or charge Mr. Baker with being under the influence of a controlled substance. [CT TS Vol. 1 at 315:21-28].

At approximately 9:14 p.m., after Mr. Baker had been arrested, transported to

Pomerado hospital, and from the hospital to the Poway Sheriff substation, Defendant Gibson had Mr. Baker's blood drawn, he testified at trial, for two reasons: to test for communicable diseases if Mr. Baker had bitten Defendant Bier (even though Defendant Bier never told Defendant Gibson he had been bitten), and to test for controlled substances. [CT TS Vol. 1 at 257:7-28, 258:1-8, 219:17-22].

Elizabeth Jaworski was interviewed, and admitted throwing the frozen bottle at Mr. Baker because she was angry. Ms. Jaworski was arrested for felony domestic violence. (Excerpt of Darin Smith Depo. at 38:13-20; 41:8-19).

C. Undisputed Material Facts.

While the parties highlight different facts in their proffers, there are certain facts that are undisputed and material. For example, it is undisputed that Plaintiff matched the description of a male who was reportedly involved in a domestic violence dispute. [Ex. A – Bier Decl. at ¶5.] It is also undisputed that Plaintiff did not comply with over one minute of verbal commands to place his hands behind his back. [Ex. A – Bier Dec. at ¶7, Ex. D – Plf. Depo at 72:17 – 22; Ex. C – Incident video at 1:24 – 2:27.] While Plaintiff testified that he kept asking Deputy Bier why he was being arrested and Deputy Bier did not respond [Ex. D – Plf depo at 70:24 – 71:1], Plaintiff admits that, when he was asked to put his hands behind his back, he did not comply:

> Q.    And what happened after you put your belongings down and sat on the curb?
> A.    He instructed me to put my hands behind my back – or he asked me whose blood is that?
>          And I told him that it was my blood; that I had just been attacked by my girlfriend. She threw a frozen bottle of Gatorade in my face and told him that – that I was the victim and that I might need medical attention.
> Q.    What happened next?
> A.    He – he told me to put my hands behind my back and that I was under arrest.
> Q.    Did you put your hands behind your back?
> A.    I told him, what – why do I need to put my hands behind my back. I told him that I'm the victim, and I asked him what is it that I'm

11

being arrested for.

Q.    And what did he say?

A.    And he said that he didn't know what I was being arrested for; that – but he was going to find out.

Q.    Did he instruct you more than one time to put your hands behind your back?

A.    Yes, he did.

Q.    How many times did he instruct you to put your hands behind your back?

A.    I don't know exactly how many.  But –

Q.    More than three?

A.    I really don't know.

Q.    Is it possible that it was more than three?

A.    I – I don't know.

Q.    Okay.

A.    To be honest.

Q.    But it was more than once?

A.    Yes, it was more than once.

Q.    Was it more than three times?
        Let me strike that.
        More than – was it more than twice?

A.    I – I really don't know.

Q.    So at least twice, but you're not sure beyond that?

A.    Yeah.  I'm not too sure beyond that.

Q.    Did he – what was he doing when he instructed you to put your hands behind your back?

A.    Well, he was like raising his voice at me and kind of shouting and – and yelling at me to put my hands behind my back.  And he pulled out his Taser and was standing a couple feet in front of me pointing his Taser at my face and said for me to put my hands behind my back or else he was going to tase me.
        And I told him, you know, that I was the victim in this altercation, I wasn't the aggressor.

Q.    Was this – you told him that previously?

A.    Yes.

Q.    So you repeated that you were the victim?

A.    Yes.

Q.    And what happened next?

A.    And I told him, you know, I'm not going to put my hands behind my back.
        And he said, if you don't put your hands behind your back, I'm going

12

to tase you.

And I said, well, then I guess you're going to have to tase me. [Plf depo, 70:11 – 72:22.]

Even after Deputy Bier went behind Plaintiff and grappled him to the ground, Plaintiff did not voluntarily put his hands behind his back. While Plaintiff testified that he was not "resisting" during this time [Plf depo., 82:3-6], he does not provide any evidence that he complied with Deputy Bier's directive to put his hands behind his back. The video is clear that Plaintiff's hands did not go behind his back until after Deputy Gibson tasered him and the deputies had to force his hands behind him. [Incident video at 3:01.] And Plaintiff acknowledges that he used profanity against the deputies during the entire incident up until the time the officers were able to handcuff him. [Plf depo., 91:22 – 92:4.]

DISCUSSION

A.      Legal Standard.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the moving party's burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to show there is a genuine issue for trial. *Id*. at 331.

The Court considers the record as a whole and draws all reasonable inferences in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.2000). The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

/ / / / /

B. Excessive Force.

As a preliminary matter, this Court previously ruled that any claims that Plaintiff "was unlawfully seized from the moment Deputy Bier attempted to place him in handcuffs by using physical force to gain control over Plaintiff, until the moment Plaintiff was released from custody on bond" [Doc. No. 13, ¶52], are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). [Doc. No. 17 at 5-6.] Therefore, it must be assumed that Deputies Bier and Gibson had the right to seize Plaintiff. Thus, the only question now is whether, in lawfully seizing Plaintiff, Defendants used excessive force.

Most of Plaintiff's proffered facts go to the issue of why Deputy Bier had to handcuff Plaintiff, when it was Plaintiff's belief that he was the victim of the domestic dispute and Plaintiff was merely trying to explain his side of the story to Deputy Bier. However, as set forth above, Plaintiff is barred from bringing any claim that the arrest or seizure was unlawful. Therefore, assuming the deputies had the right to handcuff Plaintiff, did they use excessive force?

The constitutional right at issue when it is alleged that a law enforcement officer used excessive force in the course of an arrest or other seizure is the Fourth Amendment right to be free from "unreasonable... seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The most important Graham factor is the immediacy of the threat posed to the safety of the officers or others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir.

2005) (en banc). Courts also consider the "quantum of force used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (citations omitted). The reasonableness inquiry in excessive force cases is an objective one, meaning that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

### 1. Severity of the Crimes.

At the time they were responding, it was the Deputies' understanding that Plaintiff had assaulted a woman, which is a serious crime and weighs against a finding of excessive force. *Radwan v. City of Orange*, No. SACV 08-0786AG, 2010 WL 3293354, at *17 (C.D. Aug. 18, 2010), *aff'd*, 519 F.App'x 490 (9th Cir. 2013), *citing Bryan v. MacPherson*, 608 F.3d 614, 625 (9th Cir. 2010).

### 2. Immediacy of Threat.

The "most important" *Graham* factor is whether the person "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). Here, Defendants were presented with evidence that they were encountering a domestic violence call, there has been a report that a man matching Plaintiff's description had assaulted a female, Plaintiff was agitated and yelling profanities at the deputies, and Plaintiff was refusing verbal requests to submit to handcuffing. Thus, it was reasonable for Defendants to believe Plaintiff posed a physical threat.

### 3. Active Resistance.

It is undisputed that, for almost two minutes, Plaintiff did not comply with the deputy's verbal commands to place his hands behind his back.[4] Once Deputy Bier

---

[4] Plaintiff argues that Defendants' own expert, Ronald McCarthy, agreed that verbalization during a detention is a technique that should be employed by San Diego Sheriff's Deputies when possible, and Sheriff's Deputies are directed to use this technique in San Diego Sheriff training materials "Addendum F." [Doc. No. 43 at 18.] First, Addendum F is not attached or authenticated and, therefore, is not considered. *See Hoffman v. Applicators Sales & Service, Inc.*, 439 F.3d 9, 15 (1st Cir. 2006) (chart

attempted to physically restrain him, Plaintiff tensed up and locked his wrists together to prevent Deputy Bier from using physical force to handcuff him, and continued to resist Deputy Bier's attempts to gain control of his arms when they were on the ground. After giving verbal warnings, Deputy Gibson deployed his Taser twice, in drive stun mode, before he and Deputy Bier were finally able to subdue Plaintiff. Thus, the use of force by the deputies was minor, only escalated as Plaintiff continued to resist attempts to secure him, and was not out of line with the resistance Plaintiff offered. *See Arpin v. Santa Clara Valley Trnsp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)(use of force necessary to put handcuffs on arrestee who stiffened her arm and attempted to pull free to avoid handcuffing was not excessive).

### 4. Quantum of Force.

As discussed above, the quantum of force was minor, produced minor injuries, and only escalated as Plaintiff continued to resist attempts to handcuff him. Thus, the quantum of force used was not unreasonable.

### 5. Alternative Methods.

Here, the deputies attempted several methods of restraining Plaintiff before they were finally able to subdue him enough to handcuff him. First, Deputy Bier attempted verbal commands for one to two minutes. Then, Deputy Bier attempted to physically force Plaintiff to put his hands behind his back. It was only when Deputy Gibson perceived that Deputy Bier's efforts in grappling with Plaintiff were not succeeding that he used a Taser on a low dosage. Therefore, alternative methods were explored and reasonably attempted.

---

purporting to summarize data in documents obtained through discovery could not be considered because documents themselves were not attached and authenticated). Moreover, the cited testimony merely confirms that, according to the (missing) Addendum F, verbalization would be appropriate in a situation where a deputy has a physical position of advantage over the suspect. [Doc. No. 43-1.] However, there is no opinion provided in the opposition to the motion for summary judgment as to whether the one to two minutes Deputy Bier spent talking to the Plaintiff constitutes verbalization. Therefore, in addition to being hearsay, the cited testimony is irrelevant.

6. Plaintiff's Mental and Emotional State.

Plaintiff does not argue that he had any particular mental illness, and even denies having been under the influence of methamphetamine. Therefore, this is not a factor to be addressed.

7. Warnings.

Providing warnings is a factor to consider when conducting a *Graham* analysis. *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001). Here, both deputies warned Plaintiff that they would use force if he continued to resist.

8. Conclusion.

After balancing the foregoing *Graham* factors and "[a]llow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 397, the Court concludes as a matter of law that the officers did not use excessive force. No reasonable jury could find that defendants applied an excessive amount of force during the arrest of Plaintiff. *See, e.g., Miller v. Clark County*, 340 F.3d 959, 963-68 (9th Cir. 2003) (use of trained police dog to "bite and hold" suspect until officers arrived on the scene less than a minute later does not constitute unreasonable excessive force under 4th Amendment when suspect poses immediate threat to officers' safety, several attempts to arrest suspect with less forceful means are unsuccessful as a result of suspect's defiance, and use of police dog is well-suited to task of safely arresting suspect).

For the reasons set forth above, the motion for summary judgment as to the excessive force claim is **GRANTED** on the grounds that there is no triable issue of material fact as to whether a Fourth Amendment violation occurred.

C. Qualified Immunity.

Nevertheless, even if a jury could find a Fourth Amendment violation, under the second prong of the qualified immunity test, the Court must decide if the alleged violation of Plaintiff's Fourth Amendment right against excessive force "was clearly

17

established at the time of the officer's alleged misconduct." *C.V. by and through Villegas v. City of Anaheim,* 823 F.3d 1252, 1255 (9th Cir. 2016)(citations omitted). If not, the officer receives qualified immunity. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, —— U.S. ——, 136 S.Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Further, the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," especially in the Fourth Amendment context, where "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (citations and internal quotation marks omitted). Put another way, only the "plainly incompetent" officer will not enjoy qualified immunity. *Id.* (citation omitted).

Before this Court can impose liability on Defendants, it must identify precedent as of July 19, 2013—the day of the incident—that put Defendants "on clear notice that using . . . force in these particular circumstances would be excessive*." S.B. v. County of San Diego ("S.B."),* 864 F.3d 1010, 1015 (2017). "General excessive force principles, as set forth in *Graham*[5] and *Garner*[6], are 'not inherently incapable of giving fair and clear warning to officers,' but they "do not by themselves create clearly established law outside an obvious case.'" *Id.* (citations and internal quotation marks omitted). Instead, we must "identify a case where an officer acting under similar circumstances as [Defendants] was held to have violated the Fourth Amendment." *Id.*

Plaintiff argues that specific case precedent is not required because "any

---

[5] *Graham v. Connor*, 490 U.S. 386 (1989).
[6] *Tennessee v. Garner*, 471 U.S. 1 (1985).

reasonable police officer would know that pushing an innocent, non-aggressive, non-threatening man into the street face first would violate the Fourth Amendment." [Doc. No. 43 at 19.] Plaintiff further argues that "any officer would know that jumping on top of the same innocent man, now terrified and confused, wrestling him to the ground, choking him and tasing him twice for no legitimate reason would constitute excessive force." [*Id.*]

First, Plaintiff's characterization of the evidence is wildly exaggerated and ignores this Court's previous ruling that Plaintiff is barred from bringing a claim that the seizure itself was unlawful. The only issue is whether the deputies' actions in lawfully restraining Plaintiff constituted excessive force. Was it excessive force to attempt to grapple with Plaintiff after one to two minutes of Deputy Bier verbally ordering Plaintiff to put his hands behind his back? Was it excessive force for Deputy Gibson, after seeing Deputy Bier grappling with Plaintiff, and after warning Plaintiff, to use a taser to force Plaintiff's compliance? Neither of these situations are "obvious" cases of a Fourth Amendment violation for which the general excessive force principals set forth in *Graham* and *Garner* provide clear notice to the Defendants.

While Plaintiff does not identify a particular case that would have put Defendants on notice that their actions were clearly unlawful, he does cite to the following cases for the proposition that excessive force violates the Fourth Amendment: *Washington v. Lambert*, 98 F.3d 1181, 1187-90 (9th Cir. 1996); *Hansen v. Black*, 885 F.2d 642, 644-645 (9th Cir. 1989); and *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). None of these cases, however, meet the "exacting standard" required by the U.S. Supreme Court to provide the deputies with the "clear notice" that using the amount of force they did was unlawful. *S.B.*, 864 F.3d at 1017, *citing White v. Pauley*, 137 S.Ct. 548, 551 (2017). For example, *Washington* involved an unlawful seizure. 98 F.3d. at 1185. Here, any claims Plaintiff asserts for unlawful seizure are barred. Moreover, the facts in *Washington* are dissimilar, as *Washington* involved numerous officers handcuffing two suspects for robberies that occurred six days earlier in a different part of town – and those suspects

complied with officer demands to submit to handcuffing. 98 F.3d at 1184. Therefore, *Washington* is not sufficiently similar to provide Deputies Bier and Gibson with "clear notice." *S.B.*, 864 F.3d at 1015.

The same is true of *Hansen*, which primarily involved a claim for unlawful arrest. 885 F.2d at 644. Moreover, the excessive force claim in *Hansen* pertained to an officer allegedly putting handcuffs on in an excessively violent manner and causing the plaintiff physical injuries to her wrist and arm from the handcuffing. *Id.* at 645. Here, Plaintiff's claims involve the deputies' actions <u>prior</u> to putting on the handcuffs, and Plaintiff does not claim physical injuries from the handcuffing itself. Therefore, *Hansen* is also not sufficiently similar to provide Deputies Bier and Gibson with "clear notice." *S.B.*, 864 F.3d at 1015.

Finally, *Barlow* also involved an unlawful seizure claim regarding whether police had grounds to detain someone who knocked down a sign at a protest. 943 F.2d at 1135. Moreover, the excessive force claim in *Barlow* pertained to whether police should have tackled the plaintiff from behind merely for knocking down a sign. *Id.* at 1136. This is completely different from the situation here, where Plaintiff was reportedly involved in a domestic violence incident and, for one to two minutes, refused to comply with verbal instructions to place his hands behind his back. Therefore, *Barlow* is also not sufficiently similar to provide Deputies Bier and Gibson with "clear notice." *S.B.*, 864 F.3d at 1015.

For the reasons set forth above, the cases cited by Plaintiff do not provide "clear notice" to the deputies under the "exacting standards" required by *White*. *S.B.,* 864 F.3d at 1015. Therefore, the motion for summary judgment as to the excessive force claim is **GRANTED** on the grounds of qualified immunity.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED.** Judgment shall be entered in favor of Defendants and the Clerk of the Court

15-cv-1568-CAB (DHB)

shall **CLOSE** the case.[7]

      **IT IS SO ORDERED**.

Dated:  November 14, 2017

Hon. Cathy Ann Bencivengo
United States District Judge

---

[7] All other pending motions [Doc. Nos. 37 and 38] are **DENIED AS MOOT**.

15-cv-1568-CAB (DHB)